FILED
CLERK, U.S. DISTRICT COURT
6/1/26
CENTRAL DISTRICT OF CALIFORNIA
BY CS DEPUTY
DOCUMENT SUBMITTED THROUGH THE ELECTRONIC DOCUMENT SUBMISSION SYSTEM

Iain Curtis – Shanley
38 Ridge Street
Hastings-on-Hudson, NY, 10706
1-914-519-7591
Iaincurtisshanle@aol.com

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

Iain Curtis – Shanley ) Case No.: 2:26-cv-5814

Plaintiff )

) **FIRST AMENDED COMPLAINT**

vs. ) DEMAND FOR JURY TRIAL

Charles R Drew University of Medicine and Science )

Defendant )

Facts of the Case:

1. The plaintiff, Iain Curtis – Shanley, is a resident of New York State, and resides in Westchester County.

2. The defendant, Charles R Drew University of Medicine and Science ("University"), is sued herein in connection with its Family Medicine Residency Program. The University maintains a principal place of business at 1731 East 120th Street, Los Angeles, CA 90059. The defendant is an employer under California law.
3. The plaintiff is a medical graduate who was awarded an MD upon the completion of his medical school education. In order to practice as a doctor, a medical license is necessary. This requires the completion of a medical residency in an accredited US program. Residency programs generally last 3 – 4 years and function analogously as medical apprenticeships. Residencies recruit through a yearly process known as "The Match", which is facilitated by a service known as "ERAS". Hence they are accordingly referred to either as, e.g. "Match 2025" or "ERAS 2025", with the year derived from the date the cycle ends, rather than begins. A Match cycle begins in September, when applications can be accepted, and ends in March, when results are announced on "Match Day". If selected, a medical graduate begins work as a "resident" in the beginning of July. If not selected, he must wait until September to re-apply for the yearly Match.
4. The plaintiff applied to the defendant's residency program as part of Match 2023.

5. Specifically, he sought admission/employment in the FM program, the hiring practices of which are the subject of this legal proceeding.
6. Upon Match Day 2023 (03/17/2023), the residency refused to extend employment to the plaintiff.
7. The defendant has engaged in mathematically-demonstratable discriminatory hiring practices against Whites, Males, and against White Males, as measured by the 80% hiring rule, the Hazelwood formula (a binomial significance test), and “Fisher’s Exact Test” / “Fisher Irwin Test” (abbreviated as “FET” or “FIT”), all of the statistical legal standards for judging discrimination.
8. The defendant has engaged in and maintained this discriminatory behavior over the course of years of hiring practices. The Defendant's public social media presence and institutional communications are characterized by overt advocacy for far-left political causes and political movements. These long-established and public ideological expressions serve as further evidence that the documented hiring disparities are the result of deliberate and ideologically motivated policy rather than random statistical chance.
9. Over the past 6 years, the demographic group hired at the highest rate by the defendant was, upon information and belief (based upon statistics): Blacks, in regard to race (anti-White discrimination). Regarding intersectional discrimination against White Males, the group that has been most favored is: Black Females. Regarding gender discrimination, from Match 2018 to Match

2025, the most favored group was: Females. During all these periods, only ***one*** White Male has ever been hired.

10. The plaintiff is a White heterosexual Male. All three categories are considered protected classes.

11. As per *Iadimarco v. Runyon*, 190 F.3d 151, 161 (3d Cir. 1999) and *Ames v. Ohio Department of Youth Services*, 605 U.S. 303 (2025), Whites, males, etc, are not subject to a higher level of evidentiary standard than other groups, or additional tests.

12. The Four-Fifths Rule (or 80% Rule) states that discrimination in hiring practices is proven when the hiring rate of the injured party's demographic is less than 80% of the most favored group, the one with the highest hiring rate. This method is the preliminary test relied upon by the EEOC to prove discrimination.

13. In the 6-year retrospective audit period (Match 2018 – 2023), the White selection rate (0.06%) was 1.2% the selection rate of the Most Favored group, Blacks (5.21%). In the same period (Match 2018 – 2023), the White Male selection rate (0.14%) was 2.1% the selection rate of the Most Favored group, Black Females (6.63%). Moreover, in the 8-year longitudinal period (Match 2018 – Match 2025), the Male selection rate (0.58%) was 58.0% of the Most Favored group, Females (1.01%), the most favored racial group. Throughout Match 2019 – Match 2025, there is an inexorable zero White males hired,

across 51 resident hires, in an industry and specialty where White males make up 12.73% of applicants.

14. These amounts are unambiguously beneath the 80% threshold of the Four-Fifths rule.

15. As per *Waisome v. Port Authority of New York and New Jersey*, 948 F.2d 1370 (2d Cir. 1991), and *Bouman v. Block*, 940 F.2d 1211 (9th Cir. 1991), etc, the 80% Rule satisfies the *prima facie* discrimination requirement for a motion to dismiss.

16. Likewise, from the above, the Hazelwood Test, a binomial significance test from *Hazelwood School District v. United States*, 433 U.S. 299, 308-09 n. 14 (1977), is the standard utilized to survive summary judgments. This rule requires the observed hiring statistic (the Z-score) be equal or greater than 1.96, the 95% confidence level. This requirement, for economy of words, is generally rounded up to 2, and is thus described as the two standard deviations requirement, sufficient to satisfy the *prima facie* case. Thus, the observed value (number of people hired) must fall at least 2 standard deviations from the mean that would be expected if hiring were random and neutral.

17. However, as per *Clark v. Commonwealth of Pennsylvania*, 885 F. Supp. 694 (E.D. Pa. 1994), Fisher's Exact Test may be utilized in cases that involve a smaller sample size, such as less than 30 people. The p-value ("probability

value") must be .05 or less. This p-value represents the chance that an observed disparity arose simply by random chance.

18. When subjected to the Hazelwood standard, the defendant's hiring practices yield results of, upon information and belief: for the 6-year retrospective audit (Match 2018 – 2023), anti-White disparity of -3.92, and anti – White Male disparity of -2.25. For the 8-year longitudinal period (Match 2018–2025), the anti-Male disparity is -2.13.

19. This is far beyond the two standard deviations set by the Hazelwood rule.

20. The statistical significance of these disparities is confirmed by Fisher's Exact Test (FET), which yields p-values of 5.95 x 10^(-6) for racial discrimination, 0.012 for intersectional White Male exclusion, for the 6-year retrospective audit period (Match 2019 – Match 2023); and 0.016 for anti-Male gender discrimination over the longitudinal period (Match 2018 – Match 2025).

21. This is far beyond the .05 standard required by the Fisher Exact Test.

22. Thus, based upon the defendant's hiring choices over the past several years, which are a matter of public record, and other sources, such as ERAS's yearly Match statistics, the defendant has engaged in racially discriminatory hiring practices, to such an extent as it may be legally proven by the 80% Rule and the Hazelwood Rule.

23. As per *Dothard v. Rawlinson*, 433 U.S. 321 (1977), a *prima facie* case for discrimination can be established with national statistics (*exempli gratia*, those

provided by ERAS), rather than those from the specific applicant pool or local area.

24. ERAS 2023 published statistics show, in FM, averaging data from the 2021 to 2025 (inclusive) cycles, that, per program, there were 431.2 Asian, 64.0 Black, 113.6 Hispanic, 86.3 Middle Eastern, and 267.1 White applicants per year. Likewise, there were an average of 492.8 Male applicants and 521.7 Female applicants.

25. Accordingly, Whites comprised 26.19% of the national FM applicant pool, and White Males comprised 12.73% of the national FM applicant pool. Likewise, Males were 48.6% of the applicants and Females were 51.4% of the applicants.

26. As per the NRMP 2022 Charting Outcomes report (Table FM-1), the average statistics of US IMGs ("International Medical Graduates") who successfully matched into FM were: 211 Step 1 score, 225 Step 2 CK score, 2.3 abstracts/presentations/publications, and 26.3% had another graduate degree.

27. The applicant meets all the objective statistical requirements of a matched US IMG applicant. The plaintiff also has a Master's of Biomedical Engineering and multiple scientific publications. There was thus no objective reason why the plaintiff was not hired. At the time of the Plaintiff's application, the Defendant only required a minimum score of 209 for both Step 1 and Step 2, and that these be passed on the first attempt. These were expressed as preferences rather than absolute hard cut-offs; however, as the Plaintiff met and

exceeded these requirements, there was no objective academic basis for his rejection.

28. In addition to the above, the candidate possesses numerous medical certifications, such as for Medical Coding, Wilderness Medicine, Phlebotomy, EKG, and a Limited Medical License to work as a House Doctor in NY, along with experience as an Assistant Physician. He has also successfully passed the Step 3 Exam with only 3 weeks of study. In addition, he also is certified in ACLS (Advanced Cardiac Life Support) and PALS (Pediatric Advanced Life Support). For all of the above reasons, the applicant is actually noticeably more experienced and qualified than most applicants, even the successfully matched ones.

29. Relative to the Match Cycle of 2023, the defendant in the first year, newly employed cohort of residents, employed: 1 Asian, 2 Blacks, 1 White, 3 Hispanics, and 2 Middle Easterners. In this cohort, 4 Males and 5 Females were hired. Furthermore, in this cohort 1 White Male was employed, and 1 Black Female.

30. The defendant, among year 2 cohort, employed 2 Asians, 4 Blacks, 0 Whites, 2 Hispanics, and 0 Middle Easterners. In this cohort, 4 Males and 4 Females were hired. There is an inexorable 0 in this cohort for Whites hired. Furthermore, in this cohort 0 White Males were employed, and 2 Black Females.

31. The defendant, in their year 3 cohort of residents, employed 4 Asians, 3 Blacks, 0 Whites, 1 Hispanic, and 1 Middle Easterner. In this cohort, 1 Male and 8 Females were hired. There is an inexorable 0 in this cohort for Whites hired. Furthermore, in this cohort 0 White Males were employed, and 2 Black Females.

32. The defendant does not employ a fourth year cohort of residents in their program. However, a fourth, fifth, and sixth year will be included in this calculation, in order to improve statistical power, for the 6-year retrospective audit. However, even if only 3 years are examined, the program still violates the Hazelwood standard for anti-White discrimination (-2.59 vs -3.92). In the Match 2020 cohort (which would be the 4th year), the program hired 0 Asians, 6 Blacks, 0 Whites, 1 Hispanic, and 0 Middle Easterners. Furthermore, in this cohort 0 White Males were employed, and 4 Black Females. In the Match 2019 cohort (which would be the 5th year), the program hired 5 Asians, 0 Blacks, 0 Whites, 2 Hispanics, and 1 Middle Easterner. Furthermore, in this cohort 0 White Males were employed, and 0 Black Females. In the Match 2018 cohort, 2 Asians, 5 Blacks, 0 Whites, 1 Hispanic, and 0 Middle Easterners. Furthermore, in this cohort 0 White Males were employed, and 5 Black Females. In the Match 2020 cohort, 3 Males and 4 Females were hired. In the Match 2019 cohort, 4 Males and 4 Females were hired. In the Match 2018 cohort, 1 Male and 7 Females.

33. The defendant thus employs, in their residency program, for the 6-year retrospective audit (Match 2018 – Match 2023): 14 Asians, 20 Blacks, 1 White, 10 Hispanics, and 5 Middle Easterners. In this same 6-year period, it employed 1 White Male and 14 Black Females. For the 8-year longitudinal audit (Match 2018 – Match 2025), it employed: 23 Males and 42 Females. All classifications were done in accordance with the standards of the Federal government's "OMB Directive No. 15", and through long-established and legally recognized methods, such as through name and appearance ( Hernandez v. Texas, 347 U.S. 475 (1954) ; United States v. Bhagat Singh Thind, 261 U.S. 204 (1923) ; etc ). The federal government follows similar classification methods through the Consumer Financial Protection Bureau (CFPB)'s "Bayesian Improved Surname Geocoding (BISG)" (*see* https://www.consumerfinance.gov/data-research/research-reports/using-publicly-available-information-to-proxy-for-unidentified-race-and-ethnicity/ ) for race/ethnicity, and the Social Security Administration (SSA)'s "First-Name Database Matching" for gender (*see* https://www.ssa.gov/oact/babynames/background.html ).

34. Of their 49 employees (Match 2018 – Match 2023), only 2.04% are White. In this same period, only 2.04% are White Males, and 28.57% are Black Females. Of their 65 employees (Match 2018 – Match 2025), 35.38% are Male. This from a hiring pool where Whites are 26.19% of the applicants, White Males are 12.73%, and Males are 48.6% of the applicants.

35. Whatever subjective elements the defendant employs, be it interviews or any other, they give rise to a clear disparate impact in hiring, and serve as a shield to an underlying discriminatory intent. Whether this comes about through conscious or unconscious bias, is irrelevant. See *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977 (1988); *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971); *Abrams v. Department of Public Safety*, 764 F.3d 244 (2d Cir. 2014); *EEOC v. FAPS*, Inc., No. 2:10-cv-03095 (D.N.J. 2016); etc. Furthermore, defendant's use of an electronic clearinghouse database, such as ERAS/NRMP, to transmit files does not break the chain of causation or eliminate Article III standing (injury, causation, redressability), as such systems operate strictly as passive electronic delivery conduits, analogous to a digital post office, and possess zero discretion or evaluative authority over application screening, filtering thresholds, rank list generation, or any other metric or element of the selection of candidates, either for interviews or for hiring. ERAS functions as the initial application service, NRMP is the final matching and contract formation mechanism; both of these require participants, including medical residencies, to enter into legally-binding agreements; in fact, use of the NRMP explicitly creates a binding employment commitment for both the applicant and the medical residency. Likewise, both of these stages of the application cycle are protected by State and Federal anti-discrimination laws, which govern even the initial application and screening stages (Connecticut v. Teal, 457 U.S. 440

(1982) ; Griggs v. Duke Power Co., 401 U.S. 424 (1971) ; 42 U.S.C. § 2000e-2(a)(2) ; etc).

36. The defendant has thus engaged in a consistent pattern of discriminatory hiring practices (disparate impact), and in particular discriminated against the plaintiff (disparate treatment). The plaintiff according moves the Court to remedy and address this situation.

First Cause of Action: Disparate Impact (Violation of Cal. Gov. Code § 12940 and 42 U.S.C. § 1981/1983)

37. Plaintiff incorporates by reference all the paragraphs of "Facts of the Case", paragraphs 1 – 36.

38. The defendant maintains hiring policies which are pretended to be neutral but have a significant adverse impact upon White applicants, who are not supposed to be subject to discrimination as race is regarded as a protected class under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et sequentia. Likewise, they have engaged in discrimination on the basis of gender, against Male applicants.

39. These policies have resulted in a significant statistical disparity in the hiring rates of White applicants compared to the most favored group, Blacks, as evidenced by the hiring rate ratio between Whites and Blacks being only 1.2%

for the 6-year retrospective audit, far beneath the 80% required by the Four-Fifths Rule. For intersectional discrimination, the hiring ratio for White Males compared to Black Females (the most favored group) is 2.1% for the 6-year audit. In regard to gender, the ratio of Male to Female (the most favored group) is 58.0% for the 8-year longitudinal audit, which is clearly beneath the 80% rate ratio required by the Four-Fifths Rule.

40. Moreover, when judged via the Hazelwood standard, the resulting Z-score is -3.92, for the 6-year audit period, for anti-White discrimination, far below the -1.96 standard deviations cut-off established by courts to prove a *prima facie* case of discrimination. Similarly, the Z-score for anti-White Male discrimination is -2.25. For the 8-year longitudinal audit period, discrimination against Males is -2.13, which clearly exceeds the -1.96 requirement.

41. The statistical disparity demonstrated thereby is a result of the defendant's hiring practices, which thus demonstrates a direct causal link between the policy and the harm the plaintiff has suffered.

42. As a direct and proximate result of the defendant's discriminatory practices, the plaintiff has suffered damages, including but not limited to, the ability to earn a license and practice as a doctor, lost wages, and emotional distress.

Second Cause of Action: Disparate Treatment (Violation of Cal. Gov. Code § 12940 and 42 U.S.C. § 1981/1983)

43. Plaintiff incorporates by reference all the paragraphs of "Facts of the Case", paragraphs 1 – 36.

44. The plaintiff is a White heterosexual Male, all of which are considered protected classes under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et sequentia, as it is illegal to discriminate on the basis of race, etc.

45. The plaintiff was a qualified medical graduate who met all the objective standards of successfully matched applicants to FM programs, and in addition to this, has many qualifications that most other applicants didn't have, such as a relevant Master's degree from a prestigious university, related professional work experience, the successful completion of Step 3 (the final and most difficult test), and numerous medical certifications.

46. The defendant subjected the plaintiff to an adverse employment action by refusing to extend employment to him on Match Day, 2023 (03/17/2023).

47. The circumstances surrounding this refusal give rise to an inference of discrimination. For the 6-Year Retrospective Audit (Match 2018–2023), out of 49 total hires, the Defendant hired only 1 White (Expected: 12.83), yielding a Highly Significant Hazelwood Z-score of -3.92, and 1 White Male (Expected: 6.24), yielding a Significant Z-score of -2.25. In the same 6-year window, the

White selection rate (0.06%) was only 1.2% of the Black selection rate (5.21%), well below the 80% legal threshold for presumptive discrimination; and the White Male selection rate (0.14%) was 2.1% relative to the Black Female selection rate (6.63%). Furthermore, the 8-Year Longitudinal Audit (Match 2018–2025) documents a long-standing pattern of anti-Male hiring intent that became clearer as time went on; out of 65 total hires, only 23 Males were matched (Expected: 31.59), yielding a Significant Z-score of -2.13. In that 8-year window, the Male selection rate (0.58%) was only 58% of the Female selection rate (1.01%). These figures demonstrate a persistent discriminatory intent that culminated in the Match 2023 denial.

48. As a direct and proximate result of the defendant’s intentional discriminatory practices, the plaintiff has suffered damages, including but not limited to, loss of the ability to earn a medical license and thus a future as a doctor, lost wages, and emotional distress.

Third Cause of Action: Violation of the California Fair Employment and Housing Act (FEHA), Cal. Gov. Code § 12940 et seq.

49. Plaintiff incorporates by reference all the paragraphs of “Facts of the Case”, paragraphs 1 – 36.

50. The plaintiff is a White heterosexual male, all of which are protected classes under the law.

51. The plaintiff was a qualified medical graduate who met all objective standards for successfully matched FM applicants, in addition to numerous additional qualifications that very few other applicants possessed.

52. On 03/17/2023, Match Day of the ERAS 2023 application cycle, the defendant subjected the plaintiff to an adverse employment action by refusing to offer employment to him. Territorial nexus is established in this state thus because the Defendant operates inside this state, the residency job would be performed inside this state, and the rejection decision was made by individuals physically and jurisdictionally within this state.

53. The circumstances of this case give rise to an inference of discrimination, as evidenced by the hiring rate ratio of Whites being only 1.2% that of the most favored group, Blacks, which is far beneath the 80% rule threshold, and by a Z-score of -3.92 as per the Hazelwood test, which is again far beneath the 1.96 standard deviation threshold. Similarly, in the period from Match 2018 – Match 2023, the hiring rate ratio for White Males is only 2.1% that of Black Females (the most favored gender group), with a Hazelwood Z-score of -2.25. For gender discrimination against Males, during the 8-year longitudinal audit, the hiring rate ratio is 58.0% relative to the most favored group, Females, with

a -2.13 Z-score. These are all far beneath the 80% of the Four-Fifths Rule and the -1.96 cut-off of the Hazelwood standard.

Fourth Cause of Action: Civil Rights Violations under 42 U.S.C. § 1981 / § 1983

54. Plaintiff incorporates by reference all the paragraphs of "Facts of the Case", paragraphs 1 – 36.

55. 42 U.S.C. § 1981 states: "all persons within the jurisdiction of the United States shall have the same right... to make and enforce contracts... as is enjoyed by white citizens." Likewise, 42 U.S.C. § 1983 states: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State … subjects, or causes to be subjected, any citizen of the United States … to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress …".

56. In *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273 (1976), the Supreme Court held that "Section 1981 is applicable to racial discrimination in private employment against white persons" and as such protects them from the same discriminatory standards as any other group. For Section 1983, Jett v. Dallas Independent School District, 491 U.S. 701 (1989) and Monell v. Department of

Social Services, 436 U.S. 658 (1978) are the analogous controlling Supreme Court precedents, and establish its supplemental applicability in all other cases.

57. The defendant, through its agents and employees, intentionally discriminated against the plaintiff because of his race, refusing to enter into an employment contract (ie, residency) with him on 03/17/2023. Moreover, regarding Section 1983, the defendant's discriminatory conduct proceeded from and was colored by official policy, institutional mandate, and widespread and persistent operational custom; namely, DEI / diversity initiatives, and the cumulative influence of years of past DEI/diversity training, conditioning, and negative/positive contingency/reinforcement mechanisms (ie, rewards and penalties) put in place as a result of these policies and initiatives. Both individual/collective prejudice, and institutional/governmental policies/initiatives, culminated in the discriminatory act.

58. The defendant's discriminatory hiring practices have resulted in extreme disparities against White applicants, and White Male applicants. Whites are hired at only 1.2% the rate of the Most Favored group. The Hazelwood metric of -3.92 and Fisher's Exact Test p-value of 5.95 x 10^(-6) show the extreme impossibility of this arrangement arising from chance. It is thus a result of deliberate discrimination. Likewise, White Males are hired at 2.1% the rate of the Most Favored intersectional group, Black Females. The Hazelwood Z-score for Match 2018 – Match 2023 is -2.25, which is beyond the -1.96 cutoff.

Furthermore, the gross statistical disparities in this case demonstrate a systematic, institutional denial of equal protection under the law, constituting a violation of the Equal Protection Clause of the Fourteenth Amendment, as enforced by various Federal and State laws, such as Section 1983 and other similar/related legislation.

59. These statistics demonstrate that race was the "but-for" cause of the defendant's refusal to hire the plaintiff, as he was an objectively qualified candidate who met all criteria, and yet was rejected as part of a practice of hiring that effectively excluded his race. Moreover, regarding Section 1983, the aforementioned official policies, diversity mandates, operational training customs, and related behavioral conditioning mechanisms, served as a direct moving force behind this purposeful deprivation of rights, actively driving and coloring the intentional refusal to enter into an employment contract with the plaintiff.

60. As a direct and proximate result of the defendant's violation of 42 U.S.C. § 1981 and related legislation, the plaintiff has suffered significant economic and non-economic damages, for which he seeks the full measure of compensatory and, where applicable, punitive damages allowed by law.

61. Wherefore, the plaintiff, Iain Curtis – Shanley, requests that the Court grant judgment in his favor and against the Defendant, Charles R. Drew University of Medicine and Science, and provide the following relief:

62. An order and judgment directing the Defendant to immediately offer the Plaintiff employment/admission into its FM residency program, thereby placing him in the position he would have occupied absent the discrimination. For example, through a funded, off-cycle PGY-1 position. Moreover, that it be ordered that the Defendant is barred from terminating, disciplining, or retaliating against the Plaintiff during the period necessary to complete his residency program.

63. An award for back pay (past lost wages and benefits) from March 17th, 2023, to the date of the Court's final judgment, with the appropriate interest, to compensate for the income he would have otherwise earned. The first 3 years will be valued at the salary of a medical resident, and all subsequent years thereafter at the salary of an attending physician. This is necessary to actually compensate the plaintiff for the income he would have earned and to restore him to the condition and state he would have occupied if the defendant's discriminatory actions had not occurred. Moreover, an award for the adverse tax consequences of a lump-sum payment of back-pay and other damages, often referred to as a "tax gross-up" (e.g., Eshelman v. Agere Systems, Inc., 554 F.3d 426 (3d Cir. 2009) ), to ensure the Plaintiff is made economically

whole and not penalized by increased tax liability from the compression of multiple years of lost income into a single tax year. This tax gross-up should compensate not only back-pay, but all forms of payments that would, under normal circumstances, have accumulated over time, and thus have been taxed at a lesser rate; such as, for example, front pay and lost earnings potential. The plaintiff suggests/requests this figure be derived from taking the 50th or top 25th percentile of a medical resident's salary in the state of the Defendant's place of business, multiplying that by the amount of time that has elapsed since the Defendant's discriminatory act occurred, and if the number of years since the current moment of judgment is greater than the total amount of time required for completion of the Defendant's residency program (as it was at the time of application), that all months/years thereafter be valued at the 50th or top 25th percentile of specialist attending physicians in that field in New York; and added to this, the 30% non-wage fringe benefit compensation metric estimated by the US Bureau of Labor statistics ("Employer Costs for Employee Compensation — December 2025"), which includes various items, such as medical and dental insurance, that must be acquired otherwise at expense to the Plaintiff but otherwise would have been provided to him for free as part of his employment compensation package. For residency pay, $90,000 per year is a realistic median estimate, for any specialty. The standard medical residency lasts for 3 years. With the non-wage benefits addition, that would amount to

approximately $355,000, the amount requested as compensation under this legal theory for the period of time from the discriminatory incident up to the 3-year mark. The amount thereafter should continue to accrue, with each year (or month) thereafter being valued according to the median or top 25th percentile salary of an attending physician of that specialty in New York City, with the usual 30% non-wage benefits addition added on, until the final judgment of the case and successful disbursement of judgment funds. The specific amount varies based upon specialty. As a reasonable estimate, for Family Medicine (FM) this would be $300,000 (US) dollars (approximately $390,000 per year, with the non-wage benefits addition) per year; for Internal Medicine (IM) this would be about $350,000 per year (approximately $455,000 per year, with benefits added); and for Emergency Medicine (EM) this would be about $450,000 per year (approximately $585,000 per year, with benefits added). The Plaintiff requests this award for this specific category of damages. Regarding the tax gross-up, this method of equitable remedy is recognized by cases such as Attia v. United States, Nos. 20-1801C & 21-1203C, 2025 WL 1381363 (Fed. Cl. Mar. 27, 2025) and Eshelman v. Agere Systems, Inc., 554 F.3d 426, 440-443 (3d Cir. 2009), and as per official practices such as that found in 41 CFR § 302-17.24, it should be calculated using the marginal rate inverse method, which compensates for both the increased tax burden and the taxes placed upon the gross-up itself, and thus satisfies the old legal principle of

*restitutio in integrum* ("restoration in full", "restoration to the original condition") outlined in Albemarle Paper Co. v. Moody, 422 U.S. 405 (1975) ("make-whole relief"). Tax rates vary based upon jurisdiction, but as the Plaintiff would have most likely lived in NY and practiced in NYC, and currently does live in NY, only this jurisdiction's rate is relevant for the gross-up calculations. For NY, the highest federal tax bracket (over $640,600) is 37.00%, Medicare requires 2.35%, State taxes are 10.90%, and City taxes are 3.876%, which thus amounts to a 54.126% Total Marginal Rate. For medical residents, with an approximate salary of $90,000 dollars the combined effective tax rate is approximately 21.37%, whereas for an attending, regardless of location of specialty, it is approximately 30%. The difference is approximately 25%. To compensate for taxes that are in turn paid on that, the inverse formula divides that by 1 – the top lump-sum marginal rate, which is 54.126%. The resulting total gross-up premium factor is thus 54.50%, or "0.5450". Thus, to come to the true figure necessary to satisfy the make-whole relief doctrine (Albemarle Paper Co. v. Moody, etc), all awards that time-compress longitudinal payment schedules into one lump-sum, should be multiplied by a factor of 1.5450 . Therefore, the Plaintiff's formal requested amount is the principal amount earlier stated in this paragraph, multiplied by the gross-up factor of 1.5450 .

64. An award for front pay (future earnings and benefits) to compensate for the time it should take to find comparable employment, considering realistically all circumstances involved, or in lieu of hiring (Pollard v. E.I. du Pont de Nemours & Co., 532 U.S. 843, 846 (2001) ). This "in lieu of reinstatement" might be interpreted as the full sum that would be awarded as salary during the medical residency (specifically, for the sake of estimate, the Plaintiff requests $90,000 per year of residency, thus $270,000 for the standard 3 years, with an additional 30% non-wage fringe benefit compensation, as mentioned earlier, for a total request of approximately $355,000 under this interpretation); or, in view of the fact that the lack of a medical license (which requires the completion of a medical residency) prevents all future employment and renders an MD functionally and economically useless, and with increasing time from graduation noticeably decreasing the chances of an MD graduate being hired, it might be interpreted as functionally similar to a lost earnings potential claim. The average male physician works as an attending physician a median of 35 years ("Gender Disparities in Career Longevity Among Surgeons and Physicians", *The Journal of Surgical Research*, Vol. 308 (July 2025 issue) ). If the second interpretation is adopted, the specific compensation would vary based upon specialty. For FM, this is approximately $10,500,000 US dollars ($13,650,000 with benefits, such as healthcare insurance, included); for IM this is approximately $12,250,000 US dollars (approximately $15,925,000 with

non-wage benefits); for EM this is approximately $15,750,000 US dollars (approximately $20,475,000 with benefits). The Plaintiff requests this award for this specific category of damages. For the purposes of the gross-up, the Plaintiff's formal requested amount is this principal amount multiplied by the gross-up factor of 1.5450 .

65. An award of lost earning potential, in recognition that future success in subsequent Match cycles becomes exponentially less likely and that without a residency, and thus a medical license, the plaintiff will be unable to ever practice as a doctor. Without a medical license, an MD is functionally and economically useless, and provides no economic earning potential. The plaintiff has continually and consistently attempted to gain employment, participating every year in the yearly Match for residents, and has even attempted to apply for other employment; he has thus attempted mitigation of damages, not only through the requisite "comparable" or "substantially equivalent" (Ford Motor Co. v. EEOC, 458 U.S. 219 (1982) ), but in attempting to gain any employment whatsoever. The specific award amount for lost earning potential is dependent upon specialty. For FM, this is approximately $10,500,000 US dollars ($13,650,000 with benefits, such as healthcare insurance, included); for IM this is approximately $12,250,000 US dollars (approximately $15,925,000 with benefits); for EM this is approximately $15,750,000 US dollars (approximately $20,475,000 with

benefits). The Plaintiff requests this award for this specific category of damages. For the purposes of the gross-up, the Plaintiff's formal requested amount is this principal amount multiplied by the gross-up factor of 1.5450 .

66. An order for policy changes within the Defendant's hiring practices to prevent future discrimination, such as, in this case, hiring more White heterosexual Males, and that by drawing from White ethnicities as they are generally found in the United States, rather than by narrowly selecting only one ethnicity that their biases allow them to classify as permissible. Their selection of White applicants should generally be reflective of the White ethnicities historically present in the United States in large quantities; in other words, the result that would be expected without discriminatory treatment. The program should be compelled to hire Whites, White Males, etc, according to the statistically expected amount, and not simply the minimum to avoid being legally liable, which would be obeying the letter but ignoring the spirit of the law.

67. An award for compensatory damages for emotional distress, humiliation, and other such injuries suffered by the Plaintiff as a result of the Defendant's discriminatory conduct. Failure to attain a medical residency during the Match, a potentially career-ending event, is commonly described by those who experience it as severely traumatic; much more so, if an applicant experiences it repeatedly, with anxiety and negative psychological effects amplifying with each subsequent denial as each subsequent failure often decreases the chance

an applicant will ever secure a medical residency, and thus a license to practice medicine. The Match process lasts for months (September to March), often involves interviews with programs that last hours, and involves considerable investment of money for expensive applications (sometimes regrettably drawn from family and other relations). The Plaintiff, quite reasonably and not entirely atypically, felt intense negative emotions as a result of the Defendant's actions, leading to increasingly severe feelings of agoraphobia and a hesitancy to venture outside or even be seen by anyone. This intense and persistent psychological distress, manifesting in symptoms of a well-recognized condition (agoraphobia and depression, etc), coupled with the destruction of an individual's professional future, would, as per analogous cases like Tuli v. Brigham & Women's Hospital, 656 F.3d 33, 44-47 (1st Cir. 2011) (awarded a sustained $1,600,000 for emotional distress; which would be about $2,500,000 in modern figures) and Dr. Lauren Pinter-Brown v. Regents of the University of California, No. BC624838 (Cal. Super. Ct. Los Angeles County, May 28, 2024) (awarded $9,000,000 in emotional distress damages, an amount that was sustained), justify an award of $2,000,000. The Plaintiff requests this award for this specific category of damages. It is to be remembered that the EEOC and Courts adjust "analogous case" awards to modern dollars to account for the effect of inflation (e.g. Lara G. v. Postmaster General, EEOC Request No. 0520130618 (June 9, 2017), EEOC v. AIC Security Investigations, Inc., 55

F.3d 1276 (7th Cir. 1995), Virginian Ry. Co. v. Rose, 267 F.2d 312 (4th Cir. 1959), cert. denied, 361 U.S. 837, 80 S. Ct. 89, 4 L. Ed. 2d 77 (1959), etc). Moreover, as per Rodriguez-Torres v. Caribbean Forms Mfr., Inc., 339 F.3d 52, 63-64 (1st Cir. 2005) ("We did not, however, hold that expert medical testimony was a prerequisite for an emotional distress award. Indeed, we noted that expert evidence was not required.") and Bryant v. Aiken Regional Medical Centers Inc., 333 F.3d 536, 546-47 (4th Cir. 2003), expert medical testimony is not required to prove an emotional distress award.

68. An award for punitive damages to punish the Defendant for its malicious or reckless discriminatory behavior. This includes those derived from the defendant's violation of 42 U.S.C. § 1981, or under any applicable statutory provision or legal theory allowing for such recovery from whom such damages are recoverable. Likewise, for its oppressive and malicious conduct, authorized and sanctioned by the policies and corporate culture of the defendant, through relevant State legal mechanisms, such as California Civil Code § 3294. According to US Supreme Court precedent, State Farm Mutual Automobile Insurance Company v. Campbell, 538 U.S. 408 (2003), "We cited that 4-to-1 ratio again in *Gore.* 517 U. S., at 581. The Court further referenced a long legislative history, dating back over 700 years and going forward to today, providing for sanctions of double, treble, or quadruple damages to deter and punish."; thus, a 4-to-1 ratio is acceptable for punitive to compensatory

damages. However, to calculate the total compensatory damages, the gross-up must be added. According to Cooper Industries, Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424 (2001), “Compensatory damages redress the concrete loss that a plaintiff has suffered by reason of the defendant's wrongful conduct, but punitive damages are private fines intended to punish the defendant and deter future wrongdoing”. An increased tax burden is definitely a concrete loss that a plaintiff suffers because he has to get his money through a lawsuit, in one lump sum, rather than spread out over years. And a tax gross-up clearly doesn’t fit the definition of punitive damages there listed. Incidentally, State Farm Mutual Automobile Insurance Company v. Campbell, 538 U.S. 408, 410 (2003) clarifies: “compensatory damages include an amount for emotional distress”. Thus, emotional distress is also included in this calculation. Thus for punitive damages, the Plaintiff formally requests four times the total amount awarded, by the jury or presiding entity, for compensatory damages, in which sum total is included the additions from the tax-gross ups. That is, four times the sum of the grossed-up back-pay (including quantified fringe benefits), front-pay (with benefits), lost earnings potential (with benefits), damages for emotional distress, and any other relevant compensatory damages that here might be appropriately applied. Back-pay for residency (3 years assumed, with gross-up) was calculated at about $550,000 US dollars, and emotional distress at $2,000,000 dollars; for

forward-pay and/or lost earnings potential, FM was calculated (after tax gross-up) at approximately $21,100,000 , IM at approximately $25,000,000 , and EM at approximately $31,700,000 . Therefore, depending upon specialty, the total compensatory damages would amount to around $23,650,000 US dollars for FM, $27,550,000 for IM, and $34,250,000 for EM. Punitive damages would be four times that sum: $94,600,000 for FM, $110,200,000 for IM, and $137,000,000 for EM. This is the Plaintiff's formally requested amount for punitive damages.

69. An award for all reasonable fees and expenses that may have been incurred consequent to this action, including but not limited to expert witness fees.

70. For such other and further relief as the Court may deem just and proper. Likewise, if any portion of this document is deemed technically deficient, mislabeled, or in any way defective, Plaintiff respectfully requests leave to file an amended version of it so as to remedy the deficiency or error.

71. Moreover, the plaintiff hereby requests a trial by jury.

Dated: 06/01/2026

Iain Curtis – Shanley

Iain Curtis – Shanley

## Affirmation

The statement of the Plaintiff, Iain Curtis – Shanley, is affirmed to be true under the penalties of perjury.

I am the Plaintiff in the within action. I have read the foregoing document and know the contents thereof. The same is true to my own knowledge, except as to the matters therein stated to be alleged upon information and belief, and as to those matters I believe them to be true.

I affirm this on this date, under the penalties of perjury under the laws of the United States of America and the State of current jurisdiction, which may include a fine or imprisonment, that the foregoing is true and correct, and I understand that this document may be filed in an action or proceeding in a court of law.

Executed on 06/01/2026 at Hastings-on-Hudson, NY.

Iain Curtis – Shanley

Plaintiff